FILED
12-17-2018
Clerk of Court
Marinette County
2018CV000277
Honorable David G. Miron
Branch 1

**STATE OF WISCONSIN      CIRCUIT COURT      MARINETTE COUNTY**

JOAN CAMPBELL
RICHARD CAMPBELL,
for themselves and on behalf of
all others similarly situated
N 2995 Shore Drive,
Marinette, WI 54143

     *Plaintiffs,*

     v.

TYCO FIRE PRODUCTS L.P., successor in
interest to THE ANSUL COMPANY,
One Stanton Street,
Marinette, Wisconsin 54143

CHEMGUARD, INC.
One Stanton Street,
Marinette, Wisconsin 54143

and

CHEMDESIGN, INC.,
2 Stanton Street,
Marinette, Wisconsin 54143

     *Defendants.*

Case No.

Case Code: 30703

---

### SUMMONS

---

THE STATE OF WISCONSIN, to each party named above as a Defendant:

You are hereby notified that the Plaintiffs named above have filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

Within forty-five (45) days of receiving this Summons, you must respond with a written Answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an Answer that does not follow the requirements of the statutes. The Answer must be sent or delivered to the Court, whose address is Marinette County Courthouse, 1926 Hall Avenue-2nd Floor Courthouse, Marinette, WI 54143, and to the attorneys for Plaintiff, Crueger Dickinson LLC, whose address is 4532 North Oakland Avenue, Whitefish Bay, Wisconsin 53211.

You may have an attorney help or represent you. If you do not provide a proper Answer within forty-five (45) days, the Court may grant judgment against you for the award of money damages or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money damages may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

December 17, 2018

Respectfully submitted,

**CRUEGER DICKINSON LLC**

By: s/Charles J. Crueger
Charles J. Crueger, Esq. (SBN: 1029825)
Erin K. Dickinson, Esq. (SBN: 1036707)
Krista K. Baisch, Esq. (SBN: 1050272)
Benjamin A. Kaplan, Esq. (SBN: 1082802)
4532 N. Oakland Ave.
Whitefish Bay, WI 53211
(414) 210-3868
cjc@cruegerdickinson.com
ekd@cruegerdickinson.com
kkb@cruegerdickinson.com
bak@cruegerdickinson.com

2

**NAPOLI SHKOLNIK PLLC**
Hunter Shkolnik, Esq. (SBN: 1116121)
Paul J. Napoli, Esq. (*PHV forthcoming*)
Tate J. Kunkle, Esq. (*PHV forthcoming*)
Patrick J. Lanciotti, Esq. (*PHV forthcoming*)
360 Lexington Ave., 11th Floor
New York, NY, 10017
(212) 397-1000
hunter@napolilaw.com
pnapoli@napolilaw.com
tkunkle@napolilaw.com
planciotti@napolilaw.com

*Attorneys for Plaintiffs and Putative Classes*

3

FILED
12-17-2018
Clerk of Court
Marinette County
2018CV000277
Honorable David G. Miron
Branch 1

**STATE OF WISCONSIN**   **CIRCUIT COURT**   **MARINETTE COUNTY**

---

JOAN CAMPBELL
RICHARD CAMPBELL,
for themselves and on behalf of
all others similarly situated
N 2995 Shore Drive,
Marinette, WI 54143

     *Plaintiffs,*

     v.

TYCO FIRE PRODUCTS L.P., successor in
interest to THE ANSUL COMPANY,
One Stanton Street,
Marinette, Wisconsin 54143

CHEMGUARD, INC.
One Stanton Street,
Marinette, Wisconsin 54143

and

CHEMDESIGN, INC.,
2 Stanton Street,
Marinette, Wisconsin 54143

     *Defendants.*

Case No.

Case Code: 30703

Demand for Jury Trial

---

# COMPLAINT

---

Plaintiffs, JOAN CAMPBELL and RICHARD CAMPBELL by and through their

undersigned counsel, Napoli Shkolnik PLLC, hereby file this Class Action Complaint,

individually, and on behalf of all others similarly situated, with individual claims and make these

allegations based on information and belief against Defendants, TYCO FIRE PRODUCTS L.P.,

successor in interest to THE ANSUL COMPANY, CHEMGUARD, INC. and CHEMDESIGN, INC. individually and as successor in interest to (collectively " Defendants"):

## INTRODUCTION

1.      Wisconsin has 11, 451 public water systems, the largest number of any state. The majority of Wisconsin's public water systems rely on groundwater pumped from wells. About 4 in 10 Wisconsin homes get their water from private wells. Residents of the communities receive their potable water either from private wells or from their municipal water provider.[1]

2.      Marinette County is located in Northeast Wisconsin on the shores of Green Bay bordering the Upper Peninsula of Michigan. Marinette has a population of about 10,000 and gets water from Green Bay.

3.      Marinette County has 8 municipal water systems: Coleman Waterworks, Crivitz Waterworks, Goodman Sanitary District No. 1, Marinette Waterworks, Niagara Waterworks, Peshtigo Waterworks, Pound Waterworks and Wausaukee Waterworks (the "Communities").[2]

4.      The regional groundwater flow direction in the Marinette area is generally east toward Green Bay.

5.      The Ansul Fire Technology Center ("AFTC" or the "Site") is an active fire suppressant training, testing, research and development facility in Marinette, Wisconsin owned and operated by Defendant TYCO FIRE PRODUCTS L.P.

6.      Aqueous film-foaming foam ("AFFF") is manufactured, tested and used at the AFTC facility as part of research, development, quality testing and firefighting training activities.

---

[1] Wisconsin Department of Natural Resources, Bureau of Drinking Water and Groundwater, Wisconsin Public Water Systems 2017 Annual Drinking Water Report https://dnr.wi.gov/files/PDF/pubs/DG/DG0045.pdf
[2] https://wi.water.usgs.gov/gwcomp/find/marinette/watersystems.html

5

7.    AFFF is used to control and extinguish flammable liquid fires. Per- and polyfluoroalkyl substances ("PFAS") such as perfluorooctanoic acid ("PFOA") and/or perfluorooctanesulfonic acid ("PFOS") have been present in these foams used and/or manfuctured by the Defendants at the AFTC.

8.    Tyco Fire Products L.P., successor in interest to The Ansul Company (hereinafter "Tyco/Ansul") manufactured and manufactures the Ansul brand of products, including Ansul brand AFFF.

9.    On May 2, 2012, the United States Environmental Protection Agency's ("USEPA") published its Third Unregulated Contaminant Monitoring Rule ("UCMR3") which required public water systems nationwide to monitor for thirty (30) contaminants of concern between 2013 and 2015.

10.    The UCMR3 Rule included the requirement that public water systems sample for six perfluorinated compounds ("PFCs"), including PFOA and PFOS.

11.    In October 2015, the USEPA released the results from UCMR3 which indicated the Communities' water supplies were contaminated with PFOA and PFOS.

12.    Prior to the disclosure of the UCMR3 data, there was no notification to the residents of the Communities that the water was contaminated with the carcinogenic chemicals PFOA and PFOS.

13.    In May, 2016 the USEPA established a drinking water health advisory level (HAL) of 70 parts per trillion ("ppt") (0.07$ug$/l) for the combined concentration of PFOA and PFOS.

14.    As a result of the establishment of the 70 ppt health advisory level, the Communities' water suppliers were forced to take action, including notifying the public, to reduce the PFOA/PFOS levels in the drinking water. Such actions including shutting down wells,

6

obtaining and/or purchasing alternative sources of water, and blending clean water with contaminated water to lower the level of PFCs in their customers water.

15.   Defendants have been manufacturing aqueous film-foaming foam ("AFFF") and/or using it for training activities for over for over 50 years in Marinette County.

16.   AFFF containing PFAS were discharged, disposed of or released from the AFTC and onto lands and/or water in the vicinity of Plaintiffs' property located at North 2969 Shore Drive in Marinette, Wisconsin.

17.   The highest levels of PFOA and PFOS in groundwater in Wisconsin have been detected at the AFTC. Reported concentrations are as high as 202 µg/l (micrograms per liter) – 2,800 times higher than the USEPA's Health Advisory Level of only 0.07 µg/l for the compounds combined.[3]

18.   As a direct and proximate result of Defendant's acts and omissions, Plaintiffs have suffered injury and damages from the presence of PFAS in their water wells.

19.   The Putative Class represents all those residents of Marinette County who were exposed to drinking water contaminated with PFOA and PFOS.

### THE PARTIES

**Class Representatives with Individual Personal Injury and Property Damage Claims**

20.   Plaintiffs Joan Campbell and Richard Campbell are residents of Marinette, Wisconsin, who currently reside at N 2995 Shore Drive, Marinette, WI 54143. They own the property, which currently receives water from a private well. PFCs have entered the water, property and soil, including but not limited to through the accumulation of PFCs in the pipes,

---

[3] Citizens For Safe Water Around Badger, *Wisconsin to Address PFOA/PFOS and other Groundwater Contaminants*. https://cswab.org/wisconsin-to-address-pfoa-pfos-and-other-groundwater-contaminants (last visited September 24, 2018).

faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiffs Joan Campbell and Richard Campbell have been exposed to elevated levels of PFCs through their water and have a bioaccumulation of PFCs in their blood.

21.     As a result of their exposure to PFCs in the contaminated water supply, Joan Campbell has been diagnosed with thyroid disease and thyroid cancer. Both Joan Campbell and Richard Campbell are at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and testicular and kidney cancer.

### Defendants

22.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

23.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

24.     Defendant TYCO FIRE PRODUCTS L.P., individually and successor in interest to THE ANSUL COMPANY (hereinafter "Tyco") is a Delaware corporation having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143 and headquarters at 1400 Pennbrook Parkway, Lansdale, PA 19446. Tyco manufactured and manufactures the Ansul brand of products, including Ansul brand AFFF.

8

25.     Upon information and belief, Defendant Tyco is the successor in interest to the corporation formerly known as the Ansul Company ("Ansul"). Hereinafter, Ansul and/or Tyco as the successor in interest to Ansul will be referred to collectively as "Tyco/Ansul."

26.     At all times relevant, Tyco/Ansul designed, tested, manufactured and sold AFFF, used for research, development and training purposes in the Ansul Fire Technology Center("AFTC").

27.     In 2011 Tyco/Ansul acquired Chemguard Inc.

28.     Defendant Chemguard Inc. is a Wisconsin corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

29.     At all times relevant to the present litigation, Chemguard designed, manufactured and sold AFFF, used for research, development and training purposes in the AFTC.

30.     Defendant ChemDesign, Inc. is a Texas corporation having its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

31.     At all times relevant to the present litigation, ChemDesign designed, manufactured and sold PFCs that were used in the AFFF, that was used for research, development and training purposes in the AFTC.

32.     Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

**JURISDICTION AND VENUE**

9

33.     This Court has subject matter jurisdiction pursuant to article VII, section 8 of the Wisconsin Constitution and Wis. Stat. § 801.04. This Court has jurisdiction of the subject matter in this action claiming injury to persons and their property within this state arising out of acts and/or omissions within this state by the defendants, which are corporations engaged in substantial and not isolated activities within this state. Wis. Stat. § 801.05 (1)(d)(3). The events or omissions by Defendants giving rise to the claims asserted herein occurred in the State of Wisconsin and caused harm to Plaintiffs, all of whom reside in this state. Wis. Stat. § 801.05.

34.     Venue is proper in this Court pursuant to Wis. Stat. § 801.50 (2)(a)(b)(c) because the events or omissions by Defendants giving rise to the claims asserted herein occurred in the Marinette County and caused harm to Plaintiffs and the Class Members, all of whom reside in Marinette County, where defendants do substantial business so as not to offend the traditional notions of fair play and substantial justice.

## GENERAL ALLEGATIONS

### Perfluorooctanoic acid Background

35.     Perfluorooctanoic acid (PFOA, also known as C8 or perfluorooctanoate) is a man-made, manufactured chemical not found in nature that belongs to a group of fluorine-containing chemicals called perfluorinated chemicals (PFCs). These chemicals were and are used to make household and commercial products that resist heat and chemical reactions, and repel oil, stains, grease, and water.

36.     In 1947, 3M began producing PFOA via electrochemical fluorination ("ECF").

37.     PFOA was once widely used in nonstick cookware, in surface coatings for stain-resistant carpets and fabric, and in paper and cardboard food packaging (such as microwave

10

popcorn bags and fast food containers). PFOA was also used in fire-fighting foam and in many products for the aerospace, automotive, building/construction, and electronics industries.

38.    Over the years, several companies, including but not limited to, Arkema, Asahi, BASF, Clariant, Daikin, DuPont, and Solvay Selexis have manufactured PFOA within the United States.

39.    PFOA is readily absorbed after consumption or inhalation, and it accumulates primarily in the blood stream, kidney and liver.

40.    PFOA and PFOS can cross the placental barrier during pregnancy and leads to a decrease in motor function and delayed learning.

41.    In 2006, eight major PFOA manufacturers agreed to participate in the U.S. Environmental Protection Agency's ("USEPA") PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

42.    As of May 2016, the USEPA has issued Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS.[4] The USEPA identifies the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure at 70 parts per trillion (ppt). While health advisories are non-regulatory, they reflect the USEPA's assessment of the best available peer-reviewed science.

43.    PFOA gets into the environment from industrial facilities that make PFOA or use PFOA to make other products. It also enters the environment when released from PFOA-containing consumer products during their use and disposal.

---

[4] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016)

11

44.    PFOA can remain in the environment, particularly in water, for many years. PFOA can move through soil and into groundwater or be carried in air.

45.    Human studies show associations between increased PFOA levels in blood and an increased risk of several health effects, including cardiac problems, effects on the liver, the immune system, high cholesterol levels, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), thyroid, kidney and testicular cancer. Also exposure to PFOs is tentatively associated with immune problems and low birth weight in children. [5]

46.    These injuries can arise months or years after exposure to PFOA.

47.    PFOA's extreme persistence in the environment and its toxicity, mobility and bioaccumulation potential, pose potential adverse effects to human health and the environment.

### Aqueous Film-foaming Foam

48.    Aqueous Film-foaming Foam ("AFFF") formulations are chemical mixtures used to extinguish hydrocarbon fuel-based fires.

49.    AFFF containing fluorinated surfactants have a better fire-fighting capability than plain water due to their surface-tension lowering properties- essentially smothering the fire and starving it of its oxygen.

50.    However, some fluorinated surfactants have unique properties that cause some of the compounds, if included, to not biodegrade, be bioaccumulative and toxic to animals and humans.

51.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

---

[5] Williams, Meghan C.W. and Candy S. Schrank. (April 2016). Perfluorinated compounds (PFCs) in fish from Wisconsin's major rivers and Great lakes.

12

52.    AFFF was introduced commercially in the mid-1960s and rapidly became the primary firefighting foam in the U.S. and in many parts of the world.

53.    AFFF is synthetically formed by combining fluorine free hydrocarbon foaming agents with surfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel.

54.    In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water. AFFF concentrates contain about 60-90% water and have a fluorine content of about 0.3-1.8%.

55.    PFCs used in 3M's AFFF were produced by a unique and patented process known as electrochemical fluorination ("ECF"). The ECF process resulted in a product that contains PFOS.

56.    3M was the only company to manufacture PFOS-containing AFFF.

57.    In 1947, 3M began producing PFOA via ECF.

58.    In 1951, 3M began selling its PFOA to other chemical companies.

59.    In an attempt to limit liability, 3M opted to stop producing PFOS 2002 because it was aware of the looming chemical exposure and health effects on the American public.

60.    PFOA is a man-made, manufactured chemical not found in nature. PFOA was used to make household and commercial products that resist heat and chemical reactions, and has many uses, including repelling oil, stains, grease, and water.

61.    The chemical structure of PFOA and PFOS make them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment. PFCs have been found to bioaccumulate in humans and animals.

13

62.    In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

63.    Early studies showed that PFCs accumulated in the human body and were "toxic," and 3M studies from the 1970s concluded that PFCs were "even more toxic" than previously believed.

64.    In or about 1977, Tyco/Ansul was aware of the environmental and toxic concerns of its AFFF and undertook a study and investigation on more environmentally improved AFFF.

**Health Effects of PFOS and PFOA Exposure**

65.    Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

66.    The C8 panel consisted of three independent epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, thyroid cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

67.    Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the U.S. Environmental Protection Agency's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

68.    PFOA can remain in the environment, particularly in water, for many years and can move through air, soil and into groundwater.

69.     PFOA is readily absorbed after consumption or inhalation, and it accumulates primarily in the blood stream, kidney, and liver.

70.     Human studies show associations between increased PFOA levels in blood and an increased risk of several health conditions, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

71.     These injuries can arise months or years after exposure to PFOA.

72.     PFOA's extreme persistence in the environment, along with its toxicity, mobility, and bioaccumulation potential, pose probable adverse effects to human health and the environment.

73.     Health effects of PFOS are the same as PFOA.

74.     In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[6]

75.     The USEPA's Lifetime Health Advisory and Health Effects of 70 ppt set in May 2016 was an attempt to identify the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure.[7]

---

[6] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.
[7] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016).

76.    Many states, however, have issued lower regulatory limits. For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level (MCL) of 14 ppt for PFOA.

77.    California has noticed its intent to list PFOA and PFOS to its Prop 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.

78.    The Agency for Toxic Substances and Disease Registry ("ATSDR") proposes minimum risk levels (MRLs) translating to 7 ppt for PFOS and 11 ppt for PFOA.

79.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 Million to remediate PFC contamination from military bases, as well as devoting $7 Million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.

80.    In February 2018, the Wisconsin Department of Natural Resources ("WDNR") stated that PFAS compounds meet the definition of hazardous substance and/or environment pollution under Wis. Stat. § 292.01. Therefore, persons responsible for the discharge of PFAS to waters of the State of Wisconsin were required to immediately notify the state, conduct a site investigation, determine the appropriate clean-up standards and perform the necessary response actions. Wis. Admin. Code chaps. NR 700-754. The non-industrial direct contact soil residual contaminant levels (RCLs) for both PFOA and PFOS is 1.26 mg/kg. The industrial direct contact RCL for both PFOA and PFOS is 16.4 mg/kg.[8]

---

[8] Department of Natural Resources, *Wisconsin DNR's Remediation and Redevelopment Program Has Authority to Regulate Emerging Contaminants- including PFAS Compounds* (last visited September 25, 2018). https://dnr.wi.gov/topic/brownfields/documents/bsg/1802PFCarticle.pdf

81.    Wisconsin currently follows the USEPA HAL of 70 ppt for combined PFOA and PFOS levels.

### Defendants' Ownership of the AFTC

82.    The AFTC is an active fire suppressant training, testing, research and development facility in Marinette, Wisconsin.

83.    The AFTC encompasses 380 acres including a section known as the Outdoor Testing Area, consisting of 9 acres used in connection with the Fire Training School, Research and Development and Quality Testing activities. The remaining area of the site is used for equipment manufacturing, warehousing, offices, classrooms, and parking. The Outdoor Testing Area was constructed in 1961. Since then it has been used to perform testing, demonstrations and training on a range of fire suppressants

84.    The AFTC has various buildings for fire testing, research and development and quality testing activities.

85.    The AFTC hosts fire schools and foam schools during the summer months to train employees and customers on fire suppression techniques.

86.    The Hydraulics Laboratory is used to conduct performance testing of foam systems. It has an outdoor foam monitor pad which is sloped in design so that drainage of water/foam mixture is directed back into a collection system inside the building.

87.    The two Fire Test Houses have been used for indoor fire testing, including foam and foam sprinkler testing.

88.    The Cold Storage has been used for foam testing activities, test enclosure extinguishment testing and nozzle testing.

17

89.    The Center of Excellence contains a research laboratory and an instrument laboratory, which have been used for foam products and PFCs.

90.    The Warehouse is used to store foam products and foam PFCs.

91.    The area near the AFTC is drained by ditches, which are hydraulically connected with the groundwater in Marinette, Wisconsin.[9]

92.    Water-levels measured in the AFTC monitoring well network, which is focused in the central and northeast portion of the facility, predict flow toward the east or northeast.

93.    The AFTC facility is located at 1 Stanton Street, Marinette.

94.    ChemDesign, a chemical manufacturing facility, leases various buildings on the Stanton Street premises and manufactures the PFCs used by Tyco in its foam concentrate.

95.    Tyco/Ansul rents a warehouse at 150 Pine Street in the City of Peshtigo, where it performs indoor foam proportioning of high expansion foam and foam products for research and development purposes.

96.    Tyco/Ansul rents a warehouse at 3100 Woleske Rd., Marinette that is used to store containers of foam surfactants and foam concentrate.

97.    Tyco/Ansul manufactures AFFF. This foam consists of various materials that are blended together to make a foam agent or foam concentrate. One of the materials in the blend is a surfactant, which contains PFC's. Foam concentrates contained PFC's consisting of compounds with 8 carbon chain lengths (C8).[10]

---

[9]    Tyco FireProducts LP, Revised Site Investigation Work Plan, April 2018, https://dnr.wi.gov/botw/GetActivityDetail.do?siteId=1552500&adn=0238580694

[10]  Tyco's Response Letter to WDNR Additional Information Request, submitted March 12, 2018 https://dnr.wi.gov/botw/GetActivityDetail.do?siteId=1552500&adn=0238580694

18

98.    AFFF manufactured by Tyco/Ansul has been used at the Site as part of research and development, quality testing and firefighting training activities. PFCs such as PFOA and PFOS have been present in various foam products manufactured by Tyco/Ansul. [11]

99.    Tyco/Ansul first began testing foam concentrate at the AFTC in or around 1962. This foam concentrate was manufactured by 3M and was tested in combination with a dry chemical. The AFTC became a distributor of the 3M made foams and continued testing into the 1970's.

100.    In 1973 Tyco/Ansul partnered with a chemical manufacturer to develop a telomer-based C8 foam concentrate. This product was introduced between 1973-1975 and then Tyco/Ansul terminated its distribution of the 3M foams.

101.    In 1988 Tyco/Ansul began providing third party laboratory scale testing services of foam agents for end users' and distributors' annual performance evaluation requirements.

102.    The AFTC began initial site investigation activities in 1993 to delineate the extent of soil and groundwater contamination resulting from a leaking underground storage tank. Since then, several investigation phases including a groundwater monitoring program have been conducted.[12]

103.    Petroleum and petroleum-related products as fire accelerants were used as part of the firefighting training and product testing activities at the AFTC. Initial investigation activities were implemented upon removal of a 564-gallon gasoline UST in 1992.[13]

---

[11]    Tyco     FireProducts     LP     Long-term     portable     well     sampling     plan, https://dnr.wi.gov/botw/GetActivityDetail.do?siteId=1552500&adn=0238580694

[12] Letter submitted July 5, 2016 and 2016 Investigation Report https://dnr.wi.gov/botw/GetActivityDetail.do?siteId=1552500&adn=0338001345.

[13] *Id.*

19

104.    In response to the Groundwater Sampling Work Plan, the WDNR approved a list of monitoring wells.

105.    Testing of some C6 PFC's began at AFTC between 1990s-2000. From 2006-2013, C6 and C8 foams were tested at the AFTC. Since 2014, testing has primarily focused on C6 foams.

106.    Tyco performed testing a the AFTC property in 2013 and 2014, and the results indicated that PFOS and PFOA were present in the soil and groundwater at the Site and in off-Site potable wells. [14]

107.    The AFTC is conducting corrective actions pursuant to a 2009 Administrative Order on Consent with the US EPA. The Order requires Tyco/Ansul to implement institutional controls, soil remediation, sediment removal from the Menominee River, as well as on-site groundwater management. Tyco installed a barrier made of sheet pile and a slurry wall around the entire facility border to contain arsenic-polluted groundwater on-site. Tyco is also replacing or removing parts of their storm water sewer and industrial sewer systems to prevent groundwater penetration into the outfall system.

108.    In 2016, under investigation to delineate the extent of volatile organic compound (VOC) constituents, a subset of samples were analyzed for PFAS. The PFAS analysis of 38 groundwater samples from vertical aquifer profiling (VAP) boring locations at the Site indicated the presence of PFAS compounds. PFAS analysis of 16 shallow soil samples in the Outdoor Testing Area also indicated the presence of these compounds. Groundwater and soil data from these investigation activities were submitted to Wisconsin Department of Natural Resources ("WDNR") in November 2016.[15]

---

[14] http://marinette.tycofpp.com/faqs.php.

[15]    Tyco    FireProducts    LP,    Site    Investigation    Work    Plan,    March    2018, https://dnr.wi.gov/botw/GetActivityDetail.do?siteId=1552500&adn=0238580694.

20

109.    Investigation of PFAS in off-Site groundwater began in 2017. This sampling identified PFAS in groundwater extending southeast, east and northeast from the Site. The groundwater data collected showed that PFAS concentrations detected in off-Site groundwater is due to PFAS transport through groundwater and historical stormwater runoff to the on-Site and off-Site ditches. Investigation of off-Site groundwater has included the sampling of approximately 140 private wells located predominantly to the southeast of the Site, including Plaintiffs' private well.

110.    In November 2017, Tyco launched an investigation of PFAS, conducted under the oversight of the WDNR and the Wisconsin Department of Health Services ("WDHS"). [16]

111.    A total of 24 subsurface borings were drilled, with 98 groundwater samples collected and the combined PFOA and PFOS concentrations detected ranged from non-detect to 1,653 ppt.

112.    Four samples of standing water within ditches on the AFTC were collected and the combined PFOA and PFOS concentrations detected ranged from 417 to 4,620 ppt.

113.    Testing also began on select private wells within the investigation area. Based on the first sets of groundwater investigation results, the initial sampling area (Phase 1) was defined. In Phase 1, Zone A, 8 well samples PFOA and PFOS concentrations detected more than HAL 70 ppt.

114.    On December 17, 2017 a public meeting in the Town of Peshtigo was held with the WDNR and WDHS to inform the residents of the investigation area about the work underway, and

---

[16]    Tyco    FireProducts    LP,    Site    Investigation    Work    Plan, https://dnr.wi.gov/botw/GetActivityDetail.do?siteId=1552500&adn=0238580694

Case 1:19-cv-00162-WCG    Filed 01/31/19    Page 22 of 44    Document 1-1

the plan to study private drinking water wells. Bottled water was offered to all users of drinking water wells within the private well sampling area.

115.    The study area was expanded (Phase II). Since December 2017, 137 drinking water wells have been sampled. The combined PFOA and PFOS results were as follows: detections greater than the HAL (70 ppt): 11 wells (detections ranged from 73 to 1,900 ppt) and detections less than the HAL: 29 wells (detections ranged from 3.9 to 49 ppt). Point of Entry Treatment (POET) systems were offered to owners/users of drinking water wells where PFOA and PFOS concentrations were greater than the HAL.

116.    On January 23, 2018 Tyco held a second public meeting in the Town of Peshtigo with WDNR and WDHS to present the sampling data to residents in the study area, answer questions, and discuss plans for additional studies in the area.

117.    At the January 23, 2018 meeting, Tyco stated that sampling results found detections greater than the HAL in 8 sample wells, with detections ranging from 84 to 690 ppt. [17]

118.    In March 2018, Tyco submitted a Site Investigation Work Plan to the DNR which provided plans for additional investigation of groundwater, soil, ditches and surface water. Tyco also submitted a Long-Term Potable Well Sampling Plan with a schedule for additional sampling of drinking water wells. The WDNR provided comments on those plans, and updated documents were prepared in response to those comments. The WDNR approved the updated documents.

119.    In March 2018, Tyco contacted all the drinking water well owners/users within the sampling area to collect additional spring 2018 samples.

120.    On April 30 and May 1, 2018, Tyco collected groundwater samples for PFAS analyses from 7 existing monitoring wells. One sample was collected of combined groundwater

---

[17] Community Meeting Slides, January 23, 2018

influent to the existing groundwater treatment system. PFOA concentrations detected ranged from 130 to 9,100 ng/L. PFOS concentrations detected ranged from 25 to 650ng/L.[18]

121.    In June 2018 Tyco conducted testing of groundwater for PFAS compounds at their Stanton Street facility in Marinette. Results indicated the presence of PFAS in groundwater samples collected at the Stanton Street facility.

122.    Tyco said it found chemicals in groundwater a few miles away in monitoring wells at its riverside plant. The wells were installed as part of a separate toxic cleanup of arsenic by the company.[19]

123.    Elevated levels of the chemicals have shown up in Marinette's wastewater treatment system during tests in November and May, according to the City of Marinette and WDNR records. After treating the waste, effluent containing PFCs are released into the river.

124.    WDNR directed the city to test sludge samples. The leftover sludge historically has been spread on farm fields. A city official told the Milwaukee Journal Sentinel that this practice has been taking place for 30 years.

125.    Tyco suspended all outdoor activities using foam at FTC during the winter months of 2017-2018.

126.    In its July 17, 2018 online update on contaminants migrating from its operations in northeastern Wisconsin, Tyco said PFAS has been detected in two ditches that run through and near the AFTC and lead to Green Bay.

---

[18] Stanton Street Grounwater Sample Results, June 8, 2018

[19] Bergquist, Lee. *New evidence of groundwater pollution turning up near Lake Michigan at Tyco plant in Marinette*. Milwaukee Journal Sentinel. June 18, 2018. https://www.jsonline.com/story/news/local/wisconsin/2018/06/18/new-evidence-groundwater-pollution-turning-up-near-tyco-plant/703136002/

23

127.    One of those ditches flows into Green Bay at Runnoe Park near the University of Wisconsin-Marinette; the other flows to Little River, south of the city.[20] Some water samples were taken near Lake Michigan, according to Steve Ales, the DNR's field operations manager for remediation and redevelopment.

128.    On July 19, 2018 the WDHS recommended people in affected areas within the Marinette City Limits and the Town of Peshtigo to use alternate water that does not contain PFAS above the U.S. EPA Health Advisory Level of 70 parts per trillion (ppt) for gardens.

129.    Trace amounts of the chemicals have also been detected in Marinette's municipal drinking water, according to city and DNR records. Defendants' chemicals are flowing into Lake Michigan and contaminating the water and aquatic life, including fish.

130.    Tyco/Ansul has told the DNR that some samples contain concentrations of 2,000 to 3,000 parts per trillion. Tyco reported that four samples of standing water in ditches at the company's fire training facility had concentrations of PFOA or PFOS ranging between 417 and 4,620 parts per trillion. Tyco has also said it discovered the compounds at a second location — in well samples at its manufacturing plant along the Menominee River, a tributary of Green Bay.[21]

### The Putative Class and Plaintiffs' Exposure and Damages

131.    The highest levels of PFOA and PFOS in groundwater in Wisconsin have been detected at the Tyco-Ansul Fire Technology Center in Marinette. Reported total concentrations are as high as 202 µg/l (micrograms per liter) – 2,800 times higher than the EPA's Health Advisory

---

[20] Bergquist, Lee. *In new sign of troubles, manufacturer seeks to rid chemicals in ditches that flow into Green Bay.* Milwaukee Journal Sentinel. July 19, 2018. https://www.jsonline.com/story/news/2018/07/19/tyco-unit-johnson-controls-wants-extract-pollutants/797837002/

[21] Id.

24

Level of only 0.07 μg/l for the compounds combined. The drinking water wells of dozens of nearby families have also tested positive for contamination.[22]

132.  Plaintiffs and the Putative Class have been injured as a result of consuming water with elevated levels of PFCs, including PFOA and PFOS.

133.  Plaintiffs and the Putative Class have suffered exposure, personal injury, bioaccumulation of PFCs in their blood which causes known cancers and diseases, property damage and the diminution of property value as a result of the PFC contamination caused by AFFF, of the municipal and private water supplies.

134.  As a result of years of consuming contaminated water, the Plaintiffs and the Putative Class, as residents of Marinette have been unknowingly exposed for many years to PFCs at concentrations hazardous to their health through the ingestion of PFOA and PFOS.

135.  The properties of the Plaintiffs and the Putative Class have been damaged as a result of the presence of PFCs in their homes, their soil, surrounding property and potable water supply.

136.  Plaintiffs and the Putative Class seek recovery from all Defendants for injuries, damages and losses suffered by the Plaintiffs, each of whom suffered injuries as a direct and proximate result of exposure to and consumption of PFC-contaminated water from the municipal and private drinking water supplies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

## Conspiracy

137.  Defendants actually knew of the health and environmental hazards which PFOA and PFOS posed to Plaintiffs and the Class for over 50 years.

---

[22] https://cswab.org/wisconsin-to-address-pfoa-pfos-and-other-groundwater-contaminants/

138.    Beginning in the 1970's and continuing through the date of this Complaint, Defendants formed joint task forces and committees and otherwise colluded for the avowed purpose of providing information about AFFF-containing PFOA and/or PFOS to the public and to government agencies, but with the true, unlawful purpose of:

    i.    Creating a market for AFFF-containing PFOA and/or PFOS despite knowledge of the hazards which PFOA and PFOS posed to the groundwater in Wisconsin and the residents who depend on such water;

    ii.    Concealing the environmental properties and toxic nature of PFOA and PFOS, and its impact on Plaintiffs', the Class and the environment; and

    iii.    Maximizing profits in a way Defendants knew would require them to contaminate Plaintiffs' drinking water and poison their bodies.

139.    Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

    i.    Intentionally representing to the DOD, USAF, EPA and the public that AFFF-containing PFOA and/or PFOS was safe and did not pose an environmental or human health risk;

    ii.    Concealing the dangers of PFOA and PFOS (including toxicological information on the dangers of the chemicals to living organisms, adverse fate and transport characteristics and the propensity of PFOA and PFOS to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of PFOA and PFOS be suppressed and not otherwise published and by downplaying any adverse findings relating to PFOA and PFOS;

    iii.    Concealing the dangers of AFFF-containing PFOA and/or PFOS from end users, sensitive receptors, public water suppliers, and the users and consumers of groundwater;

    iv.    Using their consideration resources to fight PFOA and PFOS regulation; and

    v.    Collectively deciding to use AFFF-containing PFOA and/or PFOS rather than other safer surfactants, because it was the most profitable surfactant for Defendants to use.

140.    As a direct and proximate result of the Defendants' above described conspiracy, PFOA and PFOS, at all times relevant to this litigation has:

26

vi.   Posed and continues to pose a health threat to Plaintiffs and the Class because it has bioaccumulated in their bodies;

vii.  Will require testing and monitoring of Plaintiffs' health for known adverse health effects of PFOA and PFOS;

viii. Contaminated Plaintiffs' property, soil and groundwater, for those with private water wells;

ix.   Will require remediation of PFOA and PFOS contaminated groundwater for those property owners who utilize a private water wells, or, where remediation of the groundwater is impractical, installation of a system to filter out PFOA and PFOS or procurement of water from alternative sources; and

x.    Diminished, and will continue to diminish the values of Plaintiffs and the Class' properties due to past, actual, impending or threatened contamination.

## CLASS ACTION ALLEGATIONS

141.  Plaintiffs incorporate the foregoing paragraphs as though the same were forth at length herein.

142.  Plaintiffs bring this action as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed subclasses and seek to certify and maintain it as a class action under Rule 803.08 of the Rules of Civil Procedure, subject to amendment and additional discovery as follows:

a.    **Medical Monitoring Class**: Individual residents of the State of Wisconsin who have ingested PFAS- contaminated water from their municipal water supplier or from a private well in or around Marinette County communities and who have suffered accumulation of PFAS in their bodies as demonstrated by blood serum tests or documentation of an increased opportunity for exposure.

b.    **Property Damage Class**: Individual residents of the State of Wisconsin who own real property in Marinette County whose private water wells have been contaminated with PFAS. This class can be readily ascertained by Census data, property records, and county records.

27

143.    Plaintiffs are members of the proposed Sub-Classes they seek to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

144.    Excluded from the Class are:

xi.    Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

xii.    The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

xiii.    Any class counsel or their immediate family members; and

xiv.    All governmental entities.

145.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

### Numerosity and Ascertainability

146.    This action meets the numerosity requirement of Rules of Civil Procedure 803.08(1)(a) given that the number of impacted individuals in Marinette County and property owners, upon information and belief, has reached the thousands, making individual joinder of class members' respective claims impracticable. While the exact number of class members is not yet known, a precise number can be ascertained from U.S. Federal Census records, the State of Wisconsin, and the public records of the municipal entities, and through other appropriate discovery. The resolution of the claims of the class members in a single action will provide substantial benefits to all parties and the Court. It is expected that the class members will number in the tens of thousands.

147.    Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

## Typicality

148.    Pursuant to Rules of Civil Procedure 803.08(1)(c), Plaintiffs' claims are typical of the claims of class members and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred damages and losses related to the introduction of PFOA, PFOS, and other PFCs into the municipal water supplies as well as private wells in the area, causing personal injury and property damages.

149.    Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members. The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

## Adequacy of Representation

150.    Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent. Rules of Civil Procedure 803.08(1)(d).

151.    Further, Plaintiffs have retained counsel competent and well experienced in class action and environmental tort litigation.

152.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the Class.

## Predominance of Common Issues

153.   There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members. Rules of Civil Procedure 803.08(1)(b). The answers to these common questions will advance resolution of the litigation as to all Class Members. Common legal and factual issues include:

i.    Whether Defendants engaged in the conduct alleged herein.

ii.   Whether Defendants knew or should have known that exposure to PFOA and PFOS could increase health risks.

iii.  Whether Defendants knew or should have known that their manufacture of PFAS and AFFF containing PFOA and PFOS was unreasonably dangerous.

iv.   Whether Defendants knew or should have known that their AFFF contained persistent, stable and mobile chemicals that were likely to contaminate groundwater water supplies.

v.    Whether Defendants failed to sufficiently warn of the potential for harm that resulted from use and testing of their products.

vi.   Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS and failed to warn users and Plaintiffs and the Class of same.

vii.  The extent to which Defendants knew about the PFOA and PFOS contamination in the water in Marinette County.

viii. The extent to which Defendants knew about the PFOA and PFOS contamination in the water supply systems in Marinette County.

ix.   The extent to which Defendants knew about the PFOA and PFOS contamination in the water supplied to private wells of residents in Marinette County.

x.    Whether the Defendants owed a duty to the Plaintiffs and the Class to refrain from the actions that caused the contamination of the drinking water with PFOA and PFOS.

xi.   Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFOA and PFOS.

xii.  For the Medical Monitoring Class, whether Plaintiffs and Class Members were exposed to water containing elevated levels of PFOA and PFOS while living in Marinette County.

xiii. For the Property Damage Class, whether the PFOA and PFOS contamination caused and continues to cause:

30

(1) A continuous invasion of the property rights of the Plaintiffs and Class such that the property values within Marinette County and/or continue to decline in value following the disclosure of the PFOA contamination; and

(2) Have substantially interfered with Plaintiffs' and the Class' use and enjoyment of their property.

xiv.    Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount.

xv.    Whether the members of the Classes and Subclasses have sustained damages and the proper measure of damages.

xvi.    Whether Manufacturing Defendants are strictly liable to Plaintiffs and the Class for their actions.

xvii.    Whether Defendants are liable to Plaintiffs and the Class for their actions.

**Superiority**

154.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Rules of Civil Procedure 803.08(2)(c). Given the great number of individuals in Marinette County impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims due to the risk of inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

**CAUSES OF ACTION**
**AS AND FOR A FIRST CAUSE OF ACTION: NEGLIGENCE**

155.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

156.    This cause of action is brought pursuant to Wisconsin law.

31

157.    Defendants failed to employ reasonable care which a reasonably prudent person should use under the circumstances by transporting, manufacturing, consuming, using, utilizing, storing, handling and/or disposing of toxic substances, including but not limited to PFOA and PFOS, in a way permitting its release into the soil and groundwater.

158.    The contamination of the groundwater supply was a foreseeable consequence of Defendants' actions at the AFTC and Plants utilizing PFAS, including but not limited to PFOS and PFOA.

159.    Defendants owed Plaintiffs a cognizable duty to exercise reasonable care in the transporting, testing, manufacturing, consuming, using, utilizing, storing, handling and/or disposing of toxic substances, including but not limited to PFOA and PFOS.

160.    Upon learning of a release of toxic substances, including but not limited to PFOA and PFOS, Defendants owed Plaintiffs a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated and reached Plaintiffs' well.

161.    Defendants breached that duty by failing to act reasonably in the transporting, manufacturing, consuming, using, utilizing, storing, handling and/or disposing of toxic substances, including but not limited to PFOA and PFOS.

162.    Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct or remedy a release of PFOA and PFOS after it occurred.

163.    Upon learning of a release of toxic substances, including but not limited to PFOA and PFOS, Defendants owed Plaintiffs a duty to timely notify Plaintiffs that the aforementioned release in the vicinity of Defendants' properties had occurred.

32

164. Defendants breached that duty by failing to timely notify Plaintiffs of any releases of toxic substances, including but not limited to PFOA and PFOS, into the environment in the vicinity of the Defendants' properties, and consequently, in the vicinity of Plaintiffs' well.

165. Defendants negligently breached their duties to Plaintiffs to ensure that their transporting, manufacturing, consuming, using, utilizing, storing, handling and/or disposing of toxic substances, including but not limited to PFOA and PFOS, was carried out in a safe and sufficiently secure manner so as to prevent the release of toxic substances, including but not limited to PFOA and PFOS, into the environment surrounding their facilities, and consequently, Plaintiffs' well.

166. Defendants' breach of their duties were the direct, sole and proximate cause of Plaintiffs' damages and imminent, substantial and impending harm to Plaintiffs' well.

167. As direct result of the foregoing, Plaintiffs seek compensatory damages in a sum to be determined by a jury at the time of trial. Upon information and belief, said amount exceeds the jurisdictional limits of the lower courts.

## AS AND FOR A SECOND CAUSE OF ACTION:
## TRESPASS

168. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

169. This cause of action is brought pursuant to the laws of Wisconsin.

170. Defendant Tyco/Ansul, as described above, is an owner of real property with the right of possession.

171. Defendants manufacture and use their products in researching and training exercises in the site with knowledge that large quantities of toxic PFOA and PFOS would contaminate the air, soil and groundwater.

33

172.  Defendants have been using AFFF for researching and training activities, allowing PFOS and PFOA to travel to the surrounding groundwater, causing contaminations of various private wells, including Plaintiffs', in various locations, in varying amounts at various times.

173.  Defendants, as owners and operators of the Facility that utilized PFOA, owed Plaintiffs a cognizable duty to exercise reasonable care to ensure that toxic substances at the Facility were disposed of reasonably and properly so as not to discharge hazardous or toxic substances, including PFOA, into the environment.

174.  At all times relevant to the present cause of action, Defendants had exclusive control over the Facility which, through acts and/or omissions by Defendants in the handling and/or disposal of material contaminated with PFOA and other chemicals, resulted in the contamination of the water supply relied upon by Plaintiffs at all relevant times.

175.  At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFOA would and/or could be introduced into the persons and property of Plaintiffs.

176.  The above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause PFOA to be disbursed onto the land.

177.  Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOA to be released into the drinking water for the Plaintiffs.

178.  Defendants' willful, wanton, and intentional failure to act and/or their affirmative choices of actions and following courses of actions have caused PFOA to enter and trespass upon the land and realty of the Plaintiffs and cause an injury to their possession and/or right of possession.

34

179.    Plaintiffs have not consented and do not consent to the trespass and contamination alleged herein. Defendants knew or reasonably should have known that the Plaintiffs did not and do not consent to this trespass.

180.    These voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiffs, their property and their right of possession of their property.

181.    Further, Defendants' actions in introducing unknown quantities of PFOA into the drinking water of Marinette County and, consequently, the persons and property of Plaintiffs were done with actual malice, and in wanton, willful and/or reckless disregard for Plaintiffs' rights, health, and property.

182.    Additionally, and/or alternatively, Defendants' decisions to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the PFOA release and contamination after having knowledge and notice of said contamination were done with actual malice, and in wanton, willful and/or reckless disregard for the rights, health, and property of Plaintiffs.

183.    Accordingly, Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons which includes but is not limited to pain and suffering and the need for medical monitoring and direct, consequential, and nominal damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

## AS AND FOR A THIRD CAUSE OF ACTION:
## ABNORMALLY DANGEROUS ACTIVITY
## AND ABSOLUTE AND STRICT LIABILITY

184.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

185.   Defendants' manufacturing, operational, and disposal practices as it related to material contaminated with PFOA and/or other ultra-hazardous toxins was negligent, reckless, and/or intentional and constituted an ultra-hazardous or abnormally dangerous activity for which Defendants are strictly liable.

186.   The Defendants manufacture, use, mishandling, and disposal of material that contained PFOA was inappropriate, given PFOA's toxicity and danger to human health, at the Facility due to the Facility's proximity to the sources of drinking water (both municipal and private wells).

187.   As a result, Defendants allowed or caused these ultra-hazardous and abnormally dangerous substances to leach into the land and ground water surrounding the Facility, including the potable water supply relied upon by Plaintiffs.

188.   Further, Defendants' contamination of the potable water supply with PFOA creates the likelihood for personal injury and property damage to individuals who use and rely upon the water.

189.   Defendants manufacture, use, mishandling, and disposal of PFOA and their reckless disregard for the consequences of their actions caused the existence of a high degree of harm to both the Plaintiffs and their property. Given the nature of PFOA, the likelihood of this harm was great.

36

190.     The risk of such activities outweighs any value associated with the same. As the result of the said ultra-hazardous or abnormally dangerous activities, Plaintiffs have suffered damages and imminent, substantial, and impeding harm to their health, their families, to the value of their home and property, and Plaintiffs have expended or will be forced to expend significant resources to safeguard their health and their property, obtain monitoring, testing, remediating services or equipment, as well as health monitoring indefinitely for years and decades into the future.

191.     Defendants are strictly liable in tort for personal injury and property damage sustained by Plaintiffs.

192.     Accordingly, Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, including medical monitoring, and direct, consequential, and nominal damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION: PRIVATE NUISANCE

193.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

194.     This cause of action is brought pursuant to Wisconsin law.

195.     Defendants' reckless, intentional and unreasonable, abnormally dangerous, and/or negligent acts and omissions, as alleged above, resulted in the discharge of PFCs, including PFOA,

37

into the environment, contaminating the municipal and private wells from which the Plaintiffs obtained their drinking water.

196.    The discharge of PFOA into the environment resulted in the contamination of the Plaintiffs' groundwater and water supply with hazardous levels of PFOA.

197.    The contamination of the groundwater and water supply has prevented and continues to prevent Plaintiffs from consuming or using the water at their property or residence and constitutes a substantial interference with the right of Plaintiffs and their property.

198.    The inability to use potable drinking water at their residences has caused the Plaintiffs significant inconvenience and expense.

199.    By reason of the foregoing, Defendants are liable to Plaintiffs for the damages that they have suffered as a result of Defendants' actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

200.    Accordingly, Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, including the need for medical monitoring, and direct, consequential, and nominal damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION: PRODUCTS LIABILITY – FAILURE TO WARN

201.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

202.    This cause of action is brought pursuant to Wisconsin law.

203.    Defendants knew or should have known that exposure to PFCs including PFOA, and PFOS was hazardous to the environment and to human health.

204.    Defendants knew or should have known that the manner in which they were manufacturing and testing AFFF, containing PFCs, was hazardous to human health and the environment.

205.    Defendants knew or should have known that the manner in which they were manufacturing AFFF containing PFCs would result in the contamination of environment. Groundwater, the municipal and private water supplies in Marinette County as a result of its proximity.

206.    Defendants had the duty to warn of the hazards associated with AFFF entering and poisoning the environment and groundwater because they knew of the dangerous, hazardous and toxic properties of the AFFF containing PFCs.

207.    Defendants failed to provide sufficient warning that the use, testing and storage of Defendants' product would cause the product to be released into the environment and cause the contamination of the environment, groundwater, and drinking water, with PFOA and PFOS.

208.    Further, this contamination led to the exposure and bioaccumulation of PFOA and PFOS of the Plaintiffs and the Class and increased their risk of developing numerous diseases as more fully set forth above.

209.    Defendants' breach of their duty to timely notify the Plaintiffs' community and act reasonably in warning of the presence of PFOA and PFOS in AFFF, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the

39

Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years.

210.    Adequate precautions, instructions and warnings could have reduced or avoided these foreseeable risks of harm to Plaintiffs and the Class and their properties.

211.    Had Defendants provided adequate warnings, Plaintiffs and the Class could have taken measures to avoid or lessen their exposure.

212.    Had Defendants provided adequate warnings to sensitive receptors, like those consuming water near its facilities, steps could have been taken to reduce or prevent the release of PFOA and PFOS into the environment, groundwater, and Plaintiffs' drinking water.

213.    Defendants' failure to warn was a direct and proximate cause of the environmental and health impacts from PFOA and PFOS that came from the use, storage and disposal of AFFF at Defendants' facilities.

214.    As such, Defendants' failure to provide adequate and sufficient warnings for the AFFF that they manufactured, marketed, and sold renders the AFFF a defective product.

215.    As a result of Defendants' conduct and the resulting contamination, the value and marketability of the property of the Plaintiffs' and Property Damage Class has been and will continue to be diminished. Plaintiffs and the Class have suffered the need for and the cost of remediation of their properties and or mitigation systems for those properties, and the cost of alterative water.

216.    As a result of the contamination, Plaintiffs and the Class have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by Defendants.

40

217.    As a result of Defendants' conduct and the resulting contamination, the Plaintiffs and the Classes have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has caused them to develop illnesses associated with this exposure as more fully described and/or significantly increased their risk of developing those illnesses.

## PUNITIVE DAMAGES

218.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

219.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing injuries, property damage, nuisances, and trespasses upon the persons and properties of Plaintiffs, disregarding their protected rights.

220.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFOA-containing materials would be effectively disposed of and not discharged into the surrounding environment and groundwater supplies.

221.    Defendants have caused great harm to the property and water supplies of Plaintiffs and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

222.    Defendants committed each of the above-described acts and omission s knowingly, willfully, and with oppression, fraud and/or malice, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiffs request an award of punitive damages in an amount enough to punish the Defendants and that fairly reflects the aggravating circumstances alleged herein.

41

Defendants are strictly, jointly and severely liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A. a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs.

B. An award of damages sufficient to establish a medical monitoring protocol for Plaintiffs and the Putative Class.

C. An award of damages for all harmful health impacts suffered by Plaintiffs and the Putative Class, caused by PFOA/S exposure.

D. An award to Plaintiffs of general, compensatory, exemplary, consequential, nominal, and punitive damages;

E. An order for an award of attorney fees and costs, as provided by law;

F. An award of pre-judgment and post-judgment interest as provided by law, and

G. An order for all such other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of any and all issues in this matter.

December 17, 2018

Respectfully submitted,

**CRUEGER DICKINSON LLC**

By: **s/Charles J. Crueger**
Charles J. Crueger, Esq. (SBN: 1029825)
Erin K. Dickinson, Esq. (SBN: 1036707)
Krista K. Baisch, Esq. (SBN: 1050272)
Benjamin A. Kaplan, Esq. (SBN: 1082802)

42

4532 N. Oakland Ave.
Whitefish Bay, WI 53211
(414) 210-3868
cjc@cruegerdickinson.com
ekd@cruegerdickinson.com
kkb@cruegerdickinson.com
bak@cruegerdickinson.com

**NAPOLI SHKOLNIK PLLC**
Hunter Shkolnik, Esq. (SBN: 1116121)
Paul J. Napoli, Esq. (*PHV forthcoming*)
Tate J. Kunkle, Esq. (*PHV forthcoming*)
Patrick J. Lanciotti, Esq. (*PHV forthcoming*)
360 Lexington Ave., 11th Floor
New York, NY, 10017
(212) 397-1000
hunter@napolilaw.com
pnapoli@napolilaw.com
tkunkle@napolilaw.com
planciotti@napolilaw.com

*Attorneys for Plaintiffs and Putative Classes*

43